# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DAKOTA LEE SHORTER,

       Defendant-Appellant.

FOR PUBLICATION
June 7, 2018

No. 338629
Ingham Circuit Court
LC No. 16-00519-FH

Before: SHAPIRO, P.J., and M. J. KELLY and O'BRIEN, JJ.

O'BRIEN, J. (*dissenting*).

I agree with the majority that the trial court erred in this case by allowing the victim to use a support dog while testifying. However, I believe that the error was harmless. Therefore, I respectfully dissent.

For preserved, nonconstitutional errors, reversal is not required unless the defendant establishes that it is more probable than not that the error was outcome determinative. *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999). This standard does not "require actual innocence, but, rather, it should be viewed as a legislative directive to presume the validity of verdicts and to reverse only with respect to those errors that affirmatively appear to undermine the reliability of the verdict." *People v Mateo*, 453 Mich 203, 211; 551 NW2d 891 (1996). Thus, "[a]n error is deemed to have been 'outcome determinative' if it undermined the reliability of the verdict." *People v Elston*, 462 Mich 751, 766; 614 NW2d 595, 602 (2000). When determining whether an error was harmless, the focus is on the nature of the error "in light of the weight and strength of the untainted evidence." *Mateo*, 453 Mich at 215.

I agree with the majority that this case—like the vast majority of criminal sexual assault cases—had "no witnesses to the actual events other than defendant and" the victim and, therefore, largely came down to "their respective credibility." However, unlike the majority, I believe that the effect—if any—of the support dog on the victim's and defendant's credibility was harmless in light of the untainted evidence that bolstered the victim's credibility and damaged defendant's.

The manager of the victim's trailer park, Joshua Kaimon, testified that, shortly after the assault occurred, defendant admitted to him that he had done something wrong. Specifically, Kaimon testified that, on the morning of the incident, he was outside of his trailer with defendant waiting for the police to arrive and asked defendant if he did "something [he] shouldn't have," to

-1-

which defendant replied, "Yea, I did."[1]  Officer Aaron Reynolds, who interviewed defendant on the morning of the assault, testified that defendant initially denied that anything occurred while he was sleeping with the victim in her bed.  However, according to Officer Reynolds, defendant later changed his story and admitted that, while the victim was sleeping, he attempted to kiss her, touched her butt, placed his hand on her upper thigh, and placed his hand underneath the victim's shirt and touched her belly and back area.  Officer Reynolds also testified that defendant told him that he had an erection "while they were cuddling."[2]  The testimony of Officer Reynolds, besides damaging defendant's credibility, provided substantive evidence to convict defendant of fourth-degree criminal sexual assault (CSC IV), MCL 750.520e(1)(b), if the jury found that defendant's touching of the victim's buttock while she was asleep was intentional and for a sexual purpose, see MCL 750.520a(f) and (q).[3]  The majority does not contend that Officer Reynolds's testimony was tainted by the victim's use of a support dog.  Therefore, even under the majority's analysis, defendant's CSC IV conviction should be upheld.  See *Mateo*, 453 Mich at 215.

In contrast to defendant's changing story, the victim's story remained unchanged: she testified at trial that she woke up to defendant's fingers inside her vagina and another hand on her bare breast.  The officer that interviewed the victim following the incident, as well as the sexual-assault nurse examiner that examined the victim, testified that, when they spoke with the victim on the morning of the incident, she told them that she woke up to defendant's fingers inside her vagina and another hand on her breast.  Evidence of the victim's unchanging story bolstered her credibility, while evidence of defendant's incriminating admissions and changing story damaged his credibility.  All of this evidence was untainted by the trial court's error of allowing a support dog to accompany the victim.

The majority's harmless-error analysis does not appear to assess the effect of the trial court's error "in light of the weight and strength of the untainted evidence." *Mateo*, 453 Mich at 215.  Instead, it rests on the following analysis:

> A juror can readily accept that a child might need support simply to be in a courtroom to be able to answer questions.  With a fully-abled adult, a juror is far more likely to conclude that the reason for the support animal or support person is

---

[1] As recognized by the majority, defendant testified that he could not remember whether he made the incriminating statement to Kaimon, but admitted that it was possible he made the statement.

[2] Defendant denied some, but not all, of the statements that Officer Reynolds attributed to him, and he corroborated the officer's testimony that he initially told the officer that nothing happened with the victim that morning.

[3] Defendant admitted that he told the officer that he grabbed the victim's buttock, but explained that it was accidental.  He also admitted that he had an erection while he was in bed with the victim that morning, but explained that it was not due to sexual arousal.

because the complainant was traumatized by the actions for which the defendant is charged.[4]

When reviewing the information—more accurately, the lack of information—placed before the jurors regarding the support dog, the majority's holding becomes unduly speculative. The support dog was barely mentioned during the course of the three-day trial. The first time it was mentioned was during voir dire when the prosecutor told jurors that the victim may be accompanied by a support dog. The prosecutor asked jurors not to draw any conclusions from the dog's presence, and all jurors confirmed that they could ignore the dog. The prosecutor did not discuss the dog any further.

The next time that the dog was mentioned to jurors was before the victim testified. At that time, the trial court told jurors that the victim would be accompanied by a support animal and gave the following instruction:

> You should disregard the [support] animal's presence and decide the case based solely on the evidence presented. You should not consider the witness's testimony to be any more or less credible because of the animal's presence. You must not allow the use of a support animal to influence your decision in any way.

The support dog was not mentioned at any point during the victim's testimony, no other witness was asked about or mentioned the support dog, and neither party referenced the support animal during closing arguments. The dog was only mentioned one other time; during final jury instructions, the trial court repeated its instruction that the jurors were to ignore the support animal and not draw any conclusions from its presence.

On this record, I see no reason to make the leaps necessary to find that a juror was "likely to conclude that the reason for the support animal . . . [was] because the complainant was traumatized by the actions for which the defendant [was] charged." No one gave any reason to jurors for why the support dog was accompanying the victim. In fact, no one even explained to jurors what a support animal was. Thus, the majority's conclusion assumes (1) that a juror had general knowledge about why someone may use a support animal and (2) what the juror was "likely to conclude" from the animal's presence. With respect to this second point, this Court has recognized that the use of a support dog "does not give rise to *primarily* prejudicial preferences, as it is possible for the jury to make a wide range of inferences from the use of this procedure that are unrelated to defendant." *People v Johnson*, 315 Mich App 163, 180; 889 NW2d 513 (2016). Yet, without explanation, the majority concludes that "a juror is far more

---

[4] This analysis does not appear to be fact specific. Rather, the majority opinion appears to require automatic-reversal if a fully-abled adult is accompanied by a support animal. Such a conclusion is contrary to this state's harmless-error jurisprudence. See *People v Graves*, 458 Mich 476, 483-484; 581 NW2d 229 (1998) (rejecting a rule for automatic reversal in harmless-error review).

-3-

likely to conclude that the reason for the support animal" is related to defendant.[5] The majority's conclusion also assumes that (1) the juror disregarded the trial court's instructions, despite the general rule that jurors are presumed to follow those instructions, *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998) and (2) the juror lied when he or she confirmed during voir dire that they could ignore the dog's presence. In my opinion, the majority's conclusion is "unduly speculative" and does not warrant finding that the error in this case was not harmless. See *id*. at 485-486 (recognizing that an error is harmless if a conclusion to the contrary is "unduly speculative").

In sum, the only error was the trial court allowing a support dog to accompany the victim. This dog—which was barely mentioned throughout trial—did not, by its mere presence, add credibility to the victim's claim of a traumatic experience because none of the jurors knew why the dog accompanied the victim. More importantly, any credibility that the support dog's presence may have added to the victim—or taken away from defendant—was minimal in light of the significant untainted evidence which damaged defendant's credibility and supported the victim's. Based on the untainted evidence, it is not more probable that, had the victim testified without the aid of a support dog, a different outcome would have resulted. See *Lukity*, 460 Mich at 495.

Because I do not believe that the error affected the reliability of the jury verdict, I would leave the jury's verdict untouched.

/s/ Colleen A. O'Brien

---

[5] The majority's conclusion appears based on the fact that the victim was a "fully-abled adult" without developmental disabilities. However, neither the victim's age nor her lack of developmental disabilities was ever placed before the jury. As such, it is speculation to even conclude that the jury viewed the victim as a fully-abled adult.

-4-